UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____x

ROXANNE RONAN,                              :
Previously known as                         :            **COMPLAINT AND DEMAND**
Roxanne Bailey                              :            **FOR JURY TRIAL**
                                            :            Docket No.  1:24-cv-07201
v.                                          :
                                            :
THE LEGAL AID SOCIETY                       :
_____x

Plaintiff, ROXANNE RONAN ("Ms. Ronan" or "Plaintiff"), and through the undersigned

counsel, Azor Law PLLC, and by way of this Complaint, seeks relief against the Defendant, The

Legal Aid Society ("LAS" or "Legal Aid" or "Defendant"), for violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*;  The New York City Human Rights Law, New

York Administrative Code § 8-502(a), *et seq.* ("NYCHRL"); the New York State Human Rights

Law, New York Executive Law § 296, *et seq.*  ("NYSHRL"); 29 U.S.C § 185; and any other cause

of action which can be inferred from the facts set forth herein. In support thereof, Plaintiff alleges

upon knowledge as to herself and her own actions, and upon information and belief as to all other

matters, as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff is an adult female citizen and resident of Richmond County, New York.

2.       Plaintiff's race is Black, and she is Caribbean American.

3.      Upon information and belief, Legal Aid is a domestic not-for-profit corporation

with its principal place of business at 199 Water Street, New York, NY  10038.

4.      Legal Aid is and has been a covered employer within the meaning of all relevant

statutes including, but not limited to, Title VII and the New York Executive Law.

5.      This Court has subject-matter and supplemental jurisdiction over this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1343, 28 U.S.C. § 1367; 42 U.S.C. §12117(a) and 42 U.S.C. §2000e (5)(f)(3).

6.      This Court has personal jurisdiction over the Defendant as its principal place of business is located within the state of New York and Defendant conducts business in the State of New York.

7.      A substantial part of the acts complained of herein occurred in Staten Island, Richmond County, New York. Thus, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## ADMINISTRATIVE PREREQUISITES AND OTHER REQUIREMENTS

8.      On May 28, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the appropriate state and local agencies.

9.      On July 17, 2024, the EEOC issued a Letter of Determination and Notice of Right to Sue finding that Defendant had engaged in employment discrimination in violation of Title VII. Plaintiff has timely brought this Complaint.

10.      Plaintiff has fully complied with all administrative prerequisites and each cause of action is timely brought.

11.      Pursuant to Section 8-502c of the New York Administrative Code, Plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation counsel.

## FACTUAL ALLEGATIONS FOR ALL CAUSES OF ACTION

12.      Plaintiff is an attorney licensed to practice law in the State of New York.

13.     Plaintiff became employed at Legal Aid in their office located in Staten Island, Richmond County, New York, as a Law Graduate in September 2018, pending her successful completion of the New York Bar Exam.

14.     Plaintiff passed the bar exam in 2019.

15.     From April 2019 to August 2019, Plaintiff was employed in the role of Investigator at Legal Aid.

16.     Plaintiff was admitted to practice in the State of New York in January 2020 and was promoted to the role of Staff Attorney upon admission.

17.     At all times relevant hereto, Plaintiff was qualified for all positions held during her employment at Legal Aid.

18.     At all times relevant hereto, Legal Aid and the Association of Legal Aid Attorneys ("ALAA"), local 2325 of the United Auto Workers, a labor organization, were parties to a valid Collective Bargaining Agreement[1] which set forth specific terms concerning the employment of staff attorneys and legal staff at Legal Aid and recognized ALAA as the exclusive bargaining representative of all Legal Aid Attorneys and legal staff.

19.     At all times relevant hereto, Plaintiff was a beneficiary to the Collective Bargaining Agreement between LAS and ALAA and a member in good standing of ALAA.

20.     At all times relevant hereto, Chris Pisciotta ("Mr. Pisciotta") was an employee and agent of Legal Aid, serving as Attorney in Charge ("AIC"), and acting directly and/or indirectly in the interest of Legal Aid. Upon information and belief, Mr. Pisciotta identifies as White.

---

[1] The Collective Bargaining Agreement is incorporated by reference herein. Defendant has possession of the Collective Bargaining Agreement referenced herein.

21.    At all times relevant hereto, Tina Luongo ("Ms. Luongo") was an employee and agent of Legal Aid, acting directly and/or indirectly in the interest of Legal Aid. Upon information and belief, Ms. Luongo identifies as White.

22.    At all times relevant hereto, Janet Sabel ("Ms. Sabel") was an employee and agent of Legal Aid, acting directly and/or indirectly in the interest of Legal Aid. Upon information and belief, Ms. Sabel identifies as White.

23.    At all times relevant hereto, Twyla Carter ("Ms. Carter") was an employee and agent of Legal Aid, directly and/or indirectly in the interest of Legal Aid. Upon information and belief, Ms. Carter identifies as Asian.

24.    Beginning in Approximately November 2018, until her wrongful discharge, Plaintiff was subjected to constant overt and covert unlawful discriminatory treatment and a hostile work environment on account of her race, and retaliation due to her opposition to the discriminatory treatment that black employees faced at LAS.

25.    In or about November 2018, Plaintiff had a racist encounter with a staff member at the Staten Island Criminal Court ("Criminal Court"). Plaintiff reported the encounter and expressed her concerns regarding the discriminatory treatment she experienced to AIC Pisciotta. As AIC, Mr. Pisciotta had the authority to address issues that affect LAS attorneys and Law Graduates in their performance of their duties while appearing in Criminal Court, with the chief judge. This included the behaviors of Criminal Court personnel toward the attorneys and Law Graduates.

26.    When Plaintiff reported the racist encounter to Mr. Pisciotta, he showed no concern for the way that Plaintiff was treated. Instead, he only inquired about the client's perception of the events that occurred. Mr. Pisciotta took no action to make the chief judge aware of the discriminatory actions of the Criminal Court personnel. Even when Mr. Pisciotta observed

discriminatory treatment of Plaintiff by a court officer on another instance, he still did not report it to the Chief Judge. As a result, nothing was done to curtail the court officers' racist behaviors against Black LAS attorneys and Law Graduates, including Plaintiff.

27.     In December 2018, Plaintiff was scheduled for her first weekend arraignment shift. Almost immediately after Plaintiff's arrival in court, a White male colleague, Michael Gompers, began yelling at Plaintiff in front of everyone in the courtroom causing much humiliation to Plaintiff. Plaintiff reported the incident to the AIC who again showed no concern about Mr. Gompers' unprofessional behavior and did not address the issue with Mr. Gompers.

28.     Upon information and belief, Mr. Gompers did not face any disciplinary action for his unprofessional conduct toward Plaintiff.

29.     Incidents such as these continued regularly and constantly throughout Plaintiff's employment at LAS and LAS created an environment where the perpetrators of racist acts toward Black employees could act without fear of discipline.

30.      Black employees regularly experienced microaggressions and overt racism from their White colleagues and leaders at LAS took no action to curtail those discriminatory behaviors.

31.     For instance, Plaintiff shared an office with a White colleague who refused to even acknowledge her. This occurred daily. Whenever a Black individual came into the office space, Plaintiff's officemate refused to acknowledge them or respond to even simple greetings. When Plaintiff complained to LAS leaders about the daily mental strain this caused and the hostility she felt every day at the office, nothing was done to reassign her to a new office, and Legal Aid took no action to address this behavior with her officemate.

32.     In addition to being subjected to racist comments, dismissed and belittled, Black attorneys at LAS are subjected to disparate treatment with respect to the terms, conditions and

privileges of their employment. Unlike the opportunities given to White attorneys, Black attorneys are denied opportunities for professional advancements, excluded from opportunities such as assisting with hearings and trials, and prevented from being mentored by senior attorneys who could aid in their professional development.

33.    The Black Attorneys of Legal Aid ("BALA"), a group of Black attorneys employed as staff attorneys with Legal Aid, often report the racist workplace and advocate for change through communications with Legal Aid leaders and through public opinion pieces[2] which are also shared with Legal Aid. However, despite being aware of the pervasiveness of racism in the work environment, Legal Aid does not discipline employees who contribute to the racist culture that permeates the work environment at Legal Aid.

34.    Similarly, the Attorneys of Color for Legal Aid ("ACLA"), a group of minority attorneys at Legal Aid, also voiced their concerns regarding the racist culture. Specifically, in one correspondence to Legal Aid leaders, they reported the following:

> … our sole Black supervisor of color is constantly marginalized from decision-making, input or meaningful participation in the leadership and management of the office. …There has been a pattern of dismissive and critical public and private correspondence by the attorney-in-charge toward questions, inquiries, problems, and concerns of attorneys of color. Unfortunately, this treatment also extends to women. There is a clear and obvious disparate treatment of attorneys of color and women vs. White men in the office.

35.    Black attorneys who did not make formal complaints concerning the discrimination they endured did not so do because they were afraid, as they observed the retaliation that their colleagues, including Plaintiff, were subjected to.

36.    Legal Aid was fully aware of the racist and hostile work environment that Black employees including Plaintiff were subjected to at LAS and at Criminal Court but did nothing to

---

[2] For instance, this BALA opinion piece:  Anthony Naro, Can *Public Defenders be Racist?* (Aug. 3, 2020), https://gideonssoldiers.com/can-public-defenders-be-racist/.

correct the discriminatory and hostile work environment, and in many instances ratified those discriminatory behaviors.

37.     Many Black attorneys have consequently resigned from LAS due to the racism that was so pervasive at LAS.

38.     In January and February 2020, Plaintiff reported discriminatory conduct by the court officers who constantly questioned her credentials and often attempted to prevent her from sitting on the bench inside the courtroom which was reserved for attorneys. The court officers always accepted the white attorneys' credentials without question. This was an ongoing issue that Black attorneys faced that the AIC was responsible to address with the Chief Judge. However, despite Plaintiff's complaints, nothing was done. The AIC routinely defended and advocated for White attorneys but refused to advocate for the Black attorneys at LAS, even when he was given an opportunity to do so.

39.     In June 2020, during an office-wide meeting held amid the nationwide protests in response to the killing of George Floyd, Plaintiff and other Black attorneys again reported the overt and covert racism that she and other Black attorneys experienced constantly at Legal Aid during a conference call with leaders at LAS. In response, a supervisor publicly denied and dismissed their concerns. The other leaders on the conference call did nothing to even acknowledge the racism and discriminatory environment that the Black attorneys reported.

40.     Among other things, Plaintiff reported that the work environment was so toxic and hostile that a White attorney felt comfortable enough to say that it was his first amendment rights to say the "N" word. LAS leaders ignored the racist comment made by the White attorney. It was not until there was extensive pushback that the incident was investigated. Ultimately, upon information and belief, the White attorney was never disciplined for his public racist statement.

41.    In or about the fall of 2020, due to rising complains of discrimination and disparate treatment of the Black attorneys at LAS, a third-party consultant was hired due to the efforts of the Director of Diversity, Equity and Inclusion. The consultant's objectives were to, in part, evaluate the culture at LAS and recommend a plan through which racial trauma healing can be facilitated and a company-wide shift toward more equity can be established. The project was titled "Racial Trauma Healing Facilitation." It was abundantly clear that the attorneys needed the services of the consultant, and that LAS was in dire need for a more inclusive and less hostile work environment, however, the leaders at LAS refused to comply with the directives of the consultant, causing her to resign in May 2021.

42.    The Consultant concluded that the project was "set up for failure" as LAS leaders were not committed to ensuring an organization-wide culture shift. Specifically, in her resignation letter, the independent consultant stated in part as follows:

> I have named in each of my previous memos how problematic and deeply harmful Chris Pisciotta and Tina Luongo are as leaders of the Legal Aid Society. It is now clear that Janet Sabel does not have the personal commitment to unlearning white supremacy and is therefore incapable of leading this organization toward the changes I agreed to support. For said reason, I am resigning from this project and this process that is evolving. It is not my design, and it puts window dressing on the anti-Blackness causing harm to staff.

43.    The consultant also indicated that she did not believe that Ms. Sabel was dedicated to changing the racist culture at LAS and in fact actively contributing to it, directing the following comment to Ms. Sabel:

> You continuously cause physiological harm to staff with your performative responses centering on your comfort and ignoring overt racism on top of the daily microaggressions that can lead to death by a thousand cuts.

44.    Many Black attorneys felt comfortable voicing their concerns regarding LAS's racist culture to the independent consultant. For instance, one Black Attorney reported as follows:

"Chris [Pisciotta] is a menacing individual. I do not feel safe or respected here, so how am I supposed to stand up for Black colleagues or anyone else when I am scared?"

45.    This comment by a Black attorney to the consultant clearly depicts how Black attorneys including Plaintiff felt daily at LAS, in a work environment that was so hostile that they feared advocating on their own behalf, even when they spent their days advocating for others.

46.    The discriminatory treatment of Plaintiff was also clear to the independent consultant who attempted to advocate for Plaintiff through communications with LAS leaders. However, her efforts were unsuccessful as LAS took no step to change the discriminatory environment. In one of her exit correspondences, the consultant stated as follows concerning her observations of the discriminatory and hostile work environment that Plaintiff faced at LAS:

I was hoping that people could start to empathize with Roxanne when she says "ouch" in the office instead of ignoring her, vilifying her or supplying her with performative/traditional responses… that is a process that takes a lot of work. A process Janet, Chris and Tina are unwilling to lead the staff through.

47.    Following the consultant's resignation, Legal Aid did not hire another consultant to help with the racist culture. Instead, Defendant allowed the racist, harassing, and hostile work environment to persist. Plaintiff continued to experience microaggressions, almost daily; and the perpetrators were able to continue their behaviors with impunity.

48.    Plaintiff remained vocal about her opposition to the discriminatory work environment. This did not lead to any change. The hostile work environment became so pervasive that it forced Plaintiff to take steps to modify her work-from home schedule. The modification complied with LAS policies and did not prevent her from maintaining her court appearances on behalf of her clients.

49.    Instead of allowing her to maintain her schedule or change the toxic environment in the office, LAS leaders spread rumors that Plaintiff was living in another country when they

9

knew that she was not. This created increased tension in the workplace for Plaintiff and caused her additional stress daily.

50.     On or about September 2022, LAS leaders required Plaintiff to attend an in-person meeting on a day when she was not scheduled to be in the office. Plaintiff's ALAA representative was compelled to advocate on Plaintiff's behalf due to the unfairness and the clear retaliatory nature of the request.

51.     Ultimately, after much advocacy, the ALAA representative was allowed to appear on Plaintiff's behalf. During the meeting, when the ALAA representative made a comment concerning the racist, retaliatory, and hostile work environment that caused Plaintiff to modify her schedule, Plaintiff's supervisor responded in sum and substance, "the world is racist, deal with it." Still, nothing was done by Defendant to curtail the discriminatory environment at LAS.

52.     In January 2023, the increased stress and anxiety caused by the discriminatory, retaliatory and hostile work environment at LAS caused Plaintiff to go on a leave of absence. Even though the leaders at LAS knew that Plaintiff was on approved leave, they wrongly accused Plaintiff of abandoning her clients. This was concerning as client abandonment could subject Plaintiff to termination, disbarment, and/or legal malpractice claims. Plaintiff felt that she had no choice but to work while on leave out of the fear of losing her employment and/or her license to practice law and out of concern for her clients, whom she feared would be abandoned by LAS in her absence.

53.     In or about February 2023, within a month of taking a leave of absence, the ALAA president received a letter of termination for Plaintiff. This was concerning because Plaintiff did not have a disciplinary history that would warrant termination.

54.     On or about April 6, 2023, immediately upon her return from leave, LAS leaders placed Plaintiff on a performance improvement plan ("PIP") and issued her a final written warning. This was unwarranted and in direct violation of the LAS policies concerning progressive discipline and in violation of the Collective Bargaining Agreement.

55.     On the same day, a Microsoft Teams meeting link with the subject line "Roxanne Bailey" to discuss the PIP was sent to all attorneys at the Staten Island officed rather than to Plaintiff directly. This caused Plaintiff much embarrassment as it was objectively clear that such meetings were scheduled to discuss performance concerns.

56.     LAS placed Plaintiff on a PIP and issued her the final written warning in retaliation for voicing her concerns about discrimination in the workplace and taking a leave of absence due to the anxiety it caused.

57.     Ultimately, after much advocacy from the ALAA representative, the final written warning was reduced to a "first written warning", but the unwarranted PIP remained.

58.     In July 2023, the PIP was extended, and Plaintiff appealed the extension by filing a grievance pursuant to LAS policies.

59.     On Friday July 28, 2023, Plaintiff's supervisor sent an email correspondence regarding the decision made on plaintiff's grievance to the entire attorney listserv in the Staten Island Office. This was the third time that sensitive information concerning Plaintiff's performance was disseminated to the entire Staten Island Attorney Listserv causing her much shock and embarrassment.

60.      In shock at the reckless and retaliatory conduct, Plaintiff inadvertently "replied all" and used offensive language to express her disagreement.  The following Monday, July 31, 2023, immediately upon realizing that the term she used was offensive, Plaintiff sent an email

correspondence to the same email chain apologizing for her use of the offensive term. Following this, several attorneys informed Plaintiff that they were not offended, understood the reason for her frustration, and accepted her apology.

61.    On or about August 9, 2023, LAS terminated Plaintiff's employment, citing "hate speech" and "attacking a colleague" as the basis for her termination.

62.    Defendant's termination of Plaintiff was retaliatory and in direct violation of Legal Aid's own rules concerning progressive discipline.

63.    Defendant's termination of Plaintiff was also in violation of the Collective Bargaining Agreement, including but not limited to its due process requirements in Section 1.8.4, prohibiting termination of a staff attorney until after the completion of the first step of the grievance process.

64.    By terminating Plaintiff, LAS also subjected Plaintiff to disparate treatment in the terms of her employment as compared with her White counterparts. White employees have often used offensive terms in group settings and through email communications but have not been terminated by LAS. Likewise, employees who make public racist comments against the Black community, their Black clients, and Black employees are not subjected to disciplinary action by Legal Aid.

65.    Further, even though LAS took the position that the multiple dissemination of information concerning disciplinary actions Plaintiff faced to all attorneys in the Staten Island Officed were deemed "inadvertent error", LAS somehow maintained that Plaintiff's first and only mistake of inadvertently replying to all was fatal.

66.    Similarly, Plaintiff's use of an offensive term was deemed worthy of bypassing the policy on progressive discipline, when White colleagues have constantly used similar and/or more

egregious terminology around the office, in group settings and via email correspondence, with impunity.

67.    Evidently, LAS terminated Plaintiff because of her race and in retaliation for her complaints of discrimination, hostile work environment and disparate treatment of Black employees.

68.    The reason provided for her termination, the July 28, 2023 email, was merely pretextual as LAS has not terminated, nor even disciplined White employees for the same conduct.

69.    For instance, months prior, a white employee made an offensive comment while in the conference room, in the presence of many attorneys. She then sent an email correspondence apologizing. The White employee was not disciplined for this action. Other White employees have made more egregious comments through emails and in person at the office, but they were never disciplined. Instead, Legal Aid leaders have either ignored or made excuses for their discriminatory actions, thereby ratifying these behaviors.

70.    After Plaintiff was terminated, Plaintiff indicated that she would be submitting a grievance pursuant to the Collective Bargaining Agreement with ALAA. In violation of the Collective Bargaining Agreement, Defendant through its leaders including Ms. Carter and Ms. Luongo, denied Plaintiff's request for paid leave pending the outcome of the grievance process.

71.    Ultimately, on or about January 2024, LAS officially denied Plaintiff's request for reinstatement.

**FIRST CAUSE OF ACTION**
**Discrimination in violation of Title VII**

72.    Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraphs 1 through 71 above as though fully set forth herein.

73.    Plaintiff is Black and was employed by Defendant during the relevant time herein.

74.    During Plaintiff's employment, Defendant through its owner, agents, officials, and/or other employees, unlawfully discriminated against Plaintiff because of her race, in violation of Title VII, by among other ways, subjecting Plaintiff to disparate terms and conditions of employment and adversely affecting Plaintiff's working conditions, by among other ways, harassing behavior on account of Plaintiff's race, failing to fully investigate complaints made by Plaintiff and others concerning the discriminatory environment at LAS, making false accusations against Plaintiff; subjecting Plaintiff to micromanagement; failing to take prompt remedial action to stop the racially based discriminatory treatment to which Plaintiff was being subjected; and terminating Plaintiff's employment.

75.    Plaintiff was affected and injured because of this discriminatory work environment.

76.    The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

77.    As a direct and proximate result of Defendant's actions and omissions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

**SECOND CAUSE OF ACTION**
**Retaliation in violation of Title VII**

78.    Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraphs 1 through 71 above as though fully set forth herein.

79.    Plaintiff engaged in protected conduct within the meaning of Title VII when she complained of discriminatory practices, racist culture and disparate treatment of Black employees at LAS.

80.     After and because Plaintiff engaged in this protected conduct, Defendant through its agents, officials, and/or employees retaliated against Plaintiff by, among other things, subjecting Plaintiff to unwarranted corrective actions, requiring that Plaintiff appear for in-person meetings when she was scheduled to work from home, placing Plaintiff on a performance improvement plan, subjecting Plaintiff to micromanagement and false accusations, directing Plaintiff's supervisor to take certain action against Plaintiff, terminating Plaintiff's employment, and refusing to comply with the terms of the Collective Bargaining Agreement.

81.     The retaliatory acts committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

82.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

## THIRD CAUSE OF ACTION
### Discrimination in violation of NYSHRL

83.     Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraphs 1 through 71 above as though fully set forth herein.

84.     Plaintiff is Black, was employed by Defendant and was qualified for her position during the relevant time herein.

85.     During Plaintiff's employment, Defendant through its owner, agents, officials, and/or other employees, unlawfully discriminated against Plaintiff because of her race, in violation of NYSHRL, by among other ways, subjecting Plaintiff to disparate terms, conditions and privileges of employment and adversely affecting Plaintiff's working conditions, by among other

ways, harassing behavior on account of Plaintiff's race, failing to fully investigate complaints made by Plaintiff and others concerning the discriminatory environment at LAS, making false accusations against Plaintiff; subjecting Plaintiff to micromanagement; failing to take prompt remedial action to stop the racially based discriminatory treatment to which Plaintiff was being subjected; and terminating Plaintiff's employment.

86.    Plaintiff was affected and injured because of this discriminatory work environment.

87.    The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's rights.

88.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

**FOURTH CAUSE OF ACTION**
**Retaliation in violation of NYSHRL**

89.    Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraphs 1 through 71 above as though fully set forth herein.

90.    Plaintiff engaged in protected conduct within the meaning of the NYSHRL when she complained of discriminatory practices prohibited by the NYSHRL.

91.    After and because Plaintiff engaged in this protected conduct, Defendant through its agents, officials, and/or employees retaliated against Plaintiff by, among other things, subjecting Plaintiff to unwarranted corrective actions, requiring that Plaintiff appear for in-person meetings when she was scheduled to work from home, placing Plaintiff on a performance improvement plan, subjecting Plaintiff to micromanagement and false accusations, directing Plaintiff's

supervisor to take certain actions against Plaintiff, terminating Plaintiff's employment, and refusing to comply with the terms of the Collective Bargaining Agreement.

92.    The retaliatory acts committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's rights.

93.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

**FIFTH CAUSE OF ACTION**
**Discrimination in violation of NYCHRL**

94.    Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraph 1 through 71 as though fully set forth herein.

95.    Plaintiff is Black, was employed by Defendant and was qualified for her position during the relevant time herein.

96.    During Plaintiff's employment, Defendant through its owner, agents, officials, and/or other employees, unlawfully discriminated against Plaintiff because of her race, in violation of NYCHRL, by among other ways, subjecting Plaintiff to disparate terms, conditions and privileges of employment and adversely affecting Plaintiff's working conditions, by among other ways, harassing behavior on account of Plaintiff's race, failing to fully investigate complaints made by Plaintiff and others concerning the discriminatory environment at LAS, making false accusations against Plaintiff; subjecting Plaintiff to micromanagement; failing to take prompt remedial action to stop the racially based discriminatory treatment to which Plaintiff was being subjected, and terminating Plaintiff's employment.

97.    Plaintiff was affected and injured because of this discriminatory work environment.

98.    The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's rights.

99.    As a direct and proximate result of Defendant's actions and omissions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

**SIXTH CAUSE OF ACTION**
**Retaliation in violation of NYCHRL**

100.    Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraphs 1 though 71 above as though fully set forth herein.

101.    Plaintiff engaged in protected conduct within the meaning of the NYCHRL when she complained of discriminatory practices prohibited by the NYCHRL.

102.    After and because Plaintiff engaged in this protected conduct, Defendant through its agents, officials, and/or employees retaliated against Plaintiff by, among other things, subjecting Plaintiff to unwarranted corrective actions, requiring that Plaintiff appear for in-person meetings when she was scheduled to work from home, placing Plaintiff on a performance improvement plan, subjecting Plaintiff to micromanagement and false accusations, directing Plaintiff's supervisor to take certain actions against Plaintiff, terminating Plaintiff employment, and refusing to comply with the terms of the Collective Bargaining Agreement.

103.    The retaliatory acts committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's rights.

104.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

**SEVENTH CAUSE OF ACTION**
**Hostile work environment**

105.    Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraph 1 though 71 above as though fully set forth herein.

106.    During Plaintiff's employment, Defendant, by and through its owner, agents, officials, and/or employees, unlawfully discriminated against Plaintiff because of her race, by among other ways subjecting Plaintiff to disparate terms and conditions of employment and adversely affecting Plaintiff's working conditions by among other ways, harassing behavior on account of Plaintiff's race, constantly subjecting Plaintiff to micromanagement,  denying her job opportunities, and failing to take prompt remedial action to stop the racially based discriminatory treatment to which Plaintiff was subjected daily.

107.    By and through these actions, Defendant created and permitted its owner, agents, officials, and/or employees to create and maintain an intimidating, insulting, and hostile work environment on the basis of Plaintiff's race, that was so severe and pervasive as to alter the conditions of Plaintiff's employment.

108.    Defendant knew or reasonably should have known of the hostile work environment and failed to take prompt remedial action to correct it.

109.    Plaintiff was injured and negatively affected by Defendant because of the discriminatory and hostile work environment.

110.    Plaintiff further provided Defendant sufficient time to remedy the intolerable and hostile work environment. However, Defendant failed to take the necessary steps to remedy the hostile work environment.

111.    The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's protected civil rights.

112.    As a direct and proximate result of Defendant's actions and omissions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

<u>**EIGHTH CAUSE OF ACTION**</u>
**Third-party beneficiary claim for breach of Collective Bargaining Agreement**

113.    Plaintiff hereby incorporates and re-alleges by reference the allegations in Paragraphs 1 through 71 as though fully set forth herein.

114.    Legal Aid entered into a Collective Bargaining Agreement with ALAA, Defendant was bound by the terms of the agreement and the procedures it required. The Agreement's terms and procedures include, but are not limited to, rules concerning job security, working conditions, and due process concerning discipline and termination. This includes, but is not limited to, the prohibition against terminating an employee until after the end of the initial grievance process and requiring the use of progressive discipline.

115.    Plaintiff was a person covered by, or an intended third-party beneficiary of the Collective Bargaining Agreement between LAS and ALAA.

116.    Defendant materially breached the terms of the Collective Bargaining Agreement and Defendant's performance was not excused.

117.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, lost benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment; justifying an award including but not limited to, back pay, lost benefits and entitlements, front pay, compensatory, consequential and punitive damages against Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Roxanne Ronan, respectfully requests that this Honorable Court grant the following relief:

a)  Enter judgment on behalf of Plaintiff and against Defendant on all causes of action herein;

b)  Award Plaintiff lost wages including front pay, back pay, and lost benefits;

c)  Award Plaintiff compensatory damages allowable under law, including but not limited to damages for loss earning potential, emotional distress, humiliation, and pain and suffering;

d)  Award Plaintiff punitive damages allowable under law;

e)  Award Plaintiff reasonable attorneys' fees, court costs, disbursements, and expenses;

f)  Award Plaintiff prejudgment and post-judgment interests, and damages for any adverse tax consequences stemming from an award; and

g)  Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury as to all issues so triable as a matter of right.

Dated:  Brooklyn, NY                    Respectfully Submitted,
         October 14, 2024

Naphtalie Azor, Esquire
AZOR LAW, PLLC
68 Jay Street, Suite 201
Brooklyn, NY 11201
Phone: (904) 902-3061
Fax:  904-680-2227
nazor@azorlaw.com
service@azorlaw.com
info@azorlaw.com