UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ROXANNE RONAN,

                              Plaintiff,

                 v.

THE LEGAL AID SOCIETY,

                              Defendant.

**MEMORANDUM AND ORDER**

24-cv-07201-LDH-RML

---

LᴀSHANN DᴇARCY HALL, United States District Judge:

Roxanne Ronan ("Plaintiff") brings the instant action against The Legal Aid Society

("LAS" or "Defendant"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII)"), the

New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights

Law (the "NYCHRL"). Specifically, Plaintiff alleges racial discrimination, a hostile work

environment, harassment, and retaliation. Defendant moves, pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, to dismiss the Amended Complaint in its entirety.

## BACKGROUND[1]

Plaintiff, a Black woman, is an attorney licensed to practice law in the State of New

York. (Am. Compl. ¶¶ 2, 12, ECF No. 15.) In September 2018, Plaintiff was employed by LAS

as a law graduate, pending her successful completion of the New York Bar Examination (the

"Bar Examination"). (*Id.* ¶ 13.) Plaintiff successfully completed the Bar Examination in 2019.

(*Id.* ¶ 14.) Thereafter, Plaintiff became employed by LAS as an Investigator, pending her

admission to the New York State Bar (the "Bar"). (*Id.* ¶ 15.) Plaintiff held the role of

Investigator from April 2019 to August 2019. (*Id.*) Following her admission to the Bar in

---

[1] The following facts are taken from the Amended Complaint and are assumed to be true for the purpose of deciding the instant motion.

January 2020, Plaintiff was promoted to the role of staff attorney. (*Id.* ¶ 16.) LAS and the Association of Legal Aid Attorneys (the "ALAA"), a labor organization, were parties to a collective bargaining agreement (the "Collective Bargaining Agreement"). (*Id.* ¶ 18.) The Collective Bargaining Agreement set forth terms concerning the employment of staff attorneys and legal staff at LAS and recognized the ALAA as the exclusive bargaining representative of LAS's attorneys and legal staff. (*Id.*) Plaintiff was a beneficiary of the Collective Bargaining Agreement and a member in good standing of the ALAA. (*Id.* ¶ 19.)

Plaintiff alleges that, in November 2018, she began experiencing, *inter alia*, "discriminatory treatment" at LAS. (Id. ¶ 24.) Plaintiff further alleges that, in or around the same month, she had a "racist encounter" with a staff member at the Staten Island Criminal Court (the "Criminal Court). (*Id.* ¶ 25.) According to the Amended Complaint, LAS's policies against discrimination extend to court officers and staff who discriminate against LAS employees. (*Id.* ¶ 25.) Additionally, plaintiff alleges that LAS's policies provide avenues through which LAS can protect its employees from discrimination from court personnel, including by raising discriminatory conduct with the Chief Judge. (*Id.*) Plaintiff reported the "racist encounter" to Chris Pisciotta, the Attorney in Charge at LAS, who, upon information and belief, identifies as white. (*Id.* ¶ 20.) In response, Mr. Pisciotta inquired about Plaintiff's perception of the alleged racist encounter, failed to alert the Chief Judge of the Criminal Court about the occurrence, and "showed no concern" regarding Plaintiff's complaint. (*Id.* ¶ 26.)

In December 2018, Plaintiff was scheduled for her first weekend arraignment shift. (*Id.* ¶ 27.) Upon Plaintiff's arrival to the court, Michael Gompers, a male colleague who identifies as white, began yelling at Plaintiff in the courtroom. (*Id.*) Plaintiff subsequently reported the incident to Mr. Pisciotta. (*Id.*) Mr. Pisciotta did not express any concern and did not address Mr.

Gompers behavior.  (*Id.*)  Plaintiff alleges that, upon information and belief, Mr. Gompers did not face any disciplinary action.  (*Id.* ¶ 28.)  Similar incidents "continued regularly and constantly throughout [her] employment at LAS."  (*Id.* ¶ 29.)

According to the Amended Complaint, Plaintiff, as well as other Black employees at LAS regularly experienced "microaggressions" and "overt racism" from white colleagues, which were not addressed by LAS.  (*Id.* ¶ 30.)  In or about January 2020, Plaintiff was assigned an office, which she shared with colleague Edri Meir, who identified as white.  (*Id.* ¶ 31.)  Plaintiff shared the office with Mr. Meir until her termination from LAS in August 2023.  (*Id.* ¶¶ 31, 63.)  Mr. Meir failed to acknowledge Plaintiff or other Black attorneys who entered their shared office.  (*Id.* ¶ 31.)  However, Mr. Meir acknowledged white individuals that came to the office.  (*Id.*)  Plaintiff complained to "LAS leaders" about Mr. Meir's behavior; however, LAS neither reassigned Plaintiff to a new office nor took action to address Mr. Meir's behavior.  (*Id.* ¶ 32.)  Moreover, according to the Amended Complaint, Black attorneys at LAS, including Plaintiff, were "subjected to disparate treatment" with respect to the professional opportunities afforded to them, when compared to their white counterparts.  (*Id.* ¶ 33.)  Such opportunities included assisting with hearings and trials and being mentored by senior attorneys.  (*Id.*)  For example, Plaintiff alleges that Mr. Meir received opportunities to serve as second-chair for hearings and trials while she did not receive similar opportunities.  (*Id.*)

The Black Attorneys of Legal Aid, a group of Black staff attorneys employed by LAS, reported "racist" instances and advocated for change.  (*Id.* ¶ 34.)  In addition, the Black Attorneys of Legal Aid, published public opinion pieces, which were subsequently shared with LAS.  (*Id.*)  The Attorneys of Color for Legal Aid, a group comprised of attorneys of color employed by LAS, similarly voiced concerns regarding "the racist culture."  (*Id.* ¶ 35.)

In as early as January 2020, but no later than February 2020, Plaintiff reported numerous instances in which court officers questioned her credentials or attempted to prevent her from sitting in the area reserved for attorneys, despite accepting the credentials of white attorneys "without question." (*Id.* ¶ 39.) Plaintiff does not allege to whom she complained about these instances. (*See id.*) However, Plaintiff does allege that, with respect to these instances, Mr. Pisciotta failed to advocate for Black attorneys employed by LAS, despite "routinely defend[ing] and advocat[ing] for [w]hite attorneys." (*Id.*) Moreover, in June 2020, during an office-wide meeting, Plaintiff and other Black attorneys reported "overt and covert racism" that they had experienced while at LAS. (*Id.* ¶ 40.) Plaintiff specifically reported that a male colleague, Richard Kopacz, who identifies as white, stated that it was his "[F]irst Amendment right to say the 'N' word." (*Id.* ¶ 41.) This incident was investigated, and Plaintiff alleges, upon information and belief, that Mr. Kopacz was not disciplined. (*Id.*)

In or about the fall of 2020, a third-party consultant was hired to, "in part, evaluate the culture at LAS . . . and [recommend] a [plan for a] company-wide shift toward more equity . . . ." (*Id.* ¶ 42.) In May 2021, the third-party consultant resigned due to "LAS['s purported] refus[al] to comply with [her] directives." (*Id.* ¶¶ 42-44.) LAS did not hire another consultant. (*Id.* ¶ 48.)

According to the Amended Complaint, the "discriminatory work environment" continued, and as a result, Plaintiff modified her work-from-home schedule. (*Id.* ¶ 49.) Plaintiff's new work-from-home schedule complied with LAS's policies and did not prevent Plaintiff from making court appearances. (*Id.*) Beginning in or about August 2022, LAS leaders spread rumors that Plaintiff was residing in another country, which, according to the Amended Complaint, "created increased tension in the workplace . . . and caused [Plaintiff] additional stress." (*Id.* ¶ 50.) On or about September 2022, LAS leaders scheduled an in-person meeting

with Plaintiff, on a day when she was not scheduled to be in the office.  (*Id.* ¶ 51.)  Plaintiff's

representative from the ALAA appeared on Plaintiff's behalf and complained of a "racist,

retaliatory, and hostile work environment."  (*Id.* ¶ 52.)  Plaintiff's supervisor responded, "in sum

and substance, '[T]he world is racist, deal with it.'"  (*Id.*)

In January 2023, Plaintiff requested and was granted a leave of absence.  (*See id.* ¶ 53.)

Plaintiff alleges that her leave of absence was caused by anxiety resulting from "the

discriminatory environment" at LAS.  (*Id.*)  LAS was required to provide coverage for her cases

while she was on leave.  (*Id.* ¶ 54.)  Nonetheless, while Plaintiff was on leave, LAS leaders

accused Plaintiff of abandoning her clients.  (*Id.*)  Out of fear of being terminated or losing her

license to practice law, Plaintiff continued working while on leave.  (*Id.*)  According to the

Amended Complaint, in or about February 2023, the ALAA President indicated that the ALAA

had received a termination letter for Plaintiff.  (*Id.* ¶ 55.)  Notwithstanding, on or about April 6,

2023, Plaintiff returned from leave, was placed on a performance improvement plan (the "PIP"),

and issued a final written warning.  (*Id.* ¶ 56.)  Plaintiff alleges that she was placed on the PIP

and issued the final warning because she voiced concerns about discrimination in the workplace

and took a leave of absence.  (*Id.* ¶ 58.) According to the Amended Complaint, Plaintiff's

placement on the PIP and the issuance of the final warning violated the Collective Bargaining

Agreement and LAS's policies concerning progressive discipline.  (*Id.* ¶ 56.)  On the same day

that Plaintiff was placed on the PIP, Plaintiff and all attorneys at LAS's Staten Island office

received an invitation titled "Roxanne Ronan," which included a meeting link that was to be used

to discuss the PIP.  (*Id.* ¶ 57.)  This caused Plaintiff embarrassment because "it was clear and

known that such meetings were scheduled to discuss performance concerns."  (*Id.*)

Although the Amended Complaint fails to identify when and with whom, at some point, a meeting regarding the PIP and final warning occurred, at which an ALAA representative appeared on Plaintiff's behalf. (*Id.* ¶ 59.) Following the meeting, the final written warning was reduced to a "first written warning." (*Id.*) The PIP was not rescinded, however. (*Id.*) And, in July 2023, the PIP was extended. (*Id.* ¶ 60.) Plaintiff appealed the extension of the PIP by filing a grievance. (*Id.*) On July 28, 2023, Plaintiff's supervisor sent an email regarding the decision on Plaintiff's appeal to all attorneys in the Staten Island office. (*Id.* ¶ 61.) In response, Plaintiff sent a reply email to the same recipients using "offensive language" to express her disagreement with the appeal decision. (*Id.* ¶ 62.) Two days later, on July 31, 2023, Plaintiff sent a second email apologizing for her use of offensive language. (*Id.*) On or about August 9, 2023, Plaintiff was terminated for her use of "hate speech" and an "attack[] a colleague." (*Id.* ¶ 63.) Plaintiff alleges that her termination violated LAS's policies regarding "progressive discipline" and the Collective Bargaining Agreement, which "prohibited termination of a staff attorney until after the completion of the first step of the grievance process." (*Id.* ¶¶ 64-65.) Moreover, according to the Amended Complaint, her white colleagues used "offensive terms" and made "egregious comments" without such resulting disciplinary action or termination. (*See id.* ¶¶ 67-70, 72, 74.)

Thereafter, Plaintiff submitted a grievance and request for paid leave. (*Id.* ¶ 75.) LAS, through its leaders, including Twyla Carter and Tina Luongo, "employee[s] and agent[s]" of LAS, (*id.* ¶¶ 21, 76), denied Plaintiff's request for paid leave and discontinued her healthcare pending determination of her grievance. (*Id.* ¶¶ 75, 77.) Plaintiff alleges, upon information and belief, that Ms. Luongo identifies as white. (*Id.* ¶ 21.) Moreover, according to the Amended Complaint, LAS regularly allowed paid leave with full benefits for white employees during the grievance process. (*Id.* ¶ 75; *see id.* ¶ 77.) On or about January 2024, LAS denied Plaintiff's

6

grievance and request for reinstatement.  (*Id.* ¶ 78.)  Also following Plaintiff's termination, Ms. Carter attended a meeting where she addressed a group of Black attorneys and stated, "in sum and substance, . . . [Plaintiff] was harmful to [B]lack people."  (*Id.* ¶ 76.)  Plaintiff alleges, upon information and belief, that Ms. Carter identifies as Asian.  (*Id.* ¶ 23.)

On May 28, 2024, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and with the "appropriate state and local agencies."  (*Id.* ¶ 8.)  On July 17, 2024, the EEOC concluded its investigation, issued a Letter of Determination finding that LAS engaged in employment discrimination in violation of Title VII, and issued a Notice of Right to Sue to Plaintiff.  (*Id.* ¶ 9.)

## STANDARD OF REVIEW

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court deciding whether to grant a motion to dismiss must "draw all reasonable inferences in [the plaintiff's] favor, assume all 'well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)) (internal citation omitted).  "[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  Further, a court is not obligated to accept a plaintiff's "conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber*, 648 F.3d at 104 (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).

## DISCUSSION

### I.    TITLE VII

#### A.   Hostile Work Environment

To be timely, a claim under Title VII, including a claim for hostile work environment, must be filed with the EEOC within "300 days of the alleged unlawful employment [act]." *Baroor v. New York City Dep't of Educ.*, 362 F. App'x 157, 159 (2d Cir. 2010) (summary order) (first citing 42 U.S.C. § 2000e–5(e); and then citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998)); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (holding claims of hostile work environment are timely so long as they are filed within 300 days of any act that "contribut[es] to the claim"). This requirement "is analogous to a statute of limitations." *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir. 1996)). As such, "if a plaintiff fails to comport with this requirement, . . . her Title VII claim is time barred." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 778 (S.D.N.Y. 2019) (citing *Morgan*, 536 U.S. at 108-09). Here, Plaintiff filed an EEOC charge on May 28, 2024. (Am. Compl. ¶ 8.) LAS argues that any hostile-work-environment claim predicated upon conduct prior to August 2, 2023 is time barred. (Def.'s Mem. L. Supp. Mot. Dismiss ("Def.'s Mem.") at 7-8, ECF No. 17.) And, as LAS's argument goes, because Plaintiff alleges no harassing conduct subsequent to August 2, 2023, Plaintiff's hostile-work-environment claim is ripe for dismissal. (*Id.* at 8.) The Court agrees.

Plaintiff does not dispute that her hostile-work-environment claim is predicated, in part, on conduct that occurred more than 300 days from the date of her EEOC complaint. (*See* Pl.'s Am. Mem. L. Opp'n Def.'s Mot. Dismiss ("Pl.'s Mem."), ECF No. 23.) In an effort to preserve

8

those aspects of her hostile-work-environment claim under Title VII, Plaintiff argues that LAS's actions were part of a "systemic practice of discrimination" and that LAS carried out at least one act contributing to her hostile-work-environment claim within 300 days of her EEOC complaint. (*Id.* at 12; *see id.* at 10-11.)  According to Plaintiff, taken together, these circumstances satisfy the conditions of the continuing violation doctrine and, therefore, render her hostile-work-environment claim timely.  (*Id.* at 10-12.)  Not so.

Here, Plaintiff alleges three acts taken by LAS within the statutory period:  (1) On August 9, 2023, LAS terminated Plaintiff, (Am. Compl. ¶ 63); (2) on the same day, following Plaintiff's termination, Ms. Carter, a leader at LAS, attended a meeting where she informed other Black attorneys at LAS that Plaintiff "was harmful to [B]lack people," (*id.* ¶ 76); and (3) LAS denied Plaintiff's request for paid leave and discontinued her healthcare pending determination on her grievance, (*id.* ¶ 78).  As an initial matter, actions that occur after a plaintiff's termination cannot serve as a basis for a hostile-work-environment claim under Title VII.  *See Estevez v. Berkeley Coll.*, No. 18-CV-10350, 2021 WL 3115452, at \*17 (S.D.N.Y. July 19, 2021) (finding that the defendant's employee's conduct "[could not] contribute to a hostile work environment, because it occurred after the plaintiff's termination and therefore could not have altered her working conditions"), *aff'd*, No. 21-1988, 2022 WL 16843460 (2d Cir. Nov. 10, 2022).  As such, even taken as true, the allegations that Ms. Carter told Black attorneys at LAS that Plaintiff "was harmful to [B]lack people" and that LAS leaders denied Plaintif's request for paid leave and discontinued her healthcare benefits cannot serve as a basis for Plaintiff's hostile-work-environment claim.  *See id.*

That Plaintiff alleged that she was terminated does not transform conduct that is untimely into conduct that is timely for the purposes of her hostile-work-environment claim.  It is true that

9

the continuing violation doctrine "allows courts to consider conduct that would ordinarily be time barred as long as the untimely incidents represent an ongoing unlawful employment practice." *Morgan*, 536 U.S. at 107 (internal quotation marks omitted) (citations omitted). The continuing violation doctrine also requires that a plaintiff, "at the very least[,] allege one act of discrimination in furtherance of the ongoing [unlawful employment practice]." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004). However, it is well settled that a discrete act, like termination, is, by its nature, not part of a continuing "unlawful employment practice." *Morgan*, 536 U.S. at 111, 114. And, absent a showing that a discreet act is "part of the course of discriminatory conduct that underlies [a plaintiff's] hostile[-]work[-]environment claim," a discreet act, alone, is insufficient to satisfy the continuing violation doctrine. *King v. Aramark Servs. Inc.*, 96 F.4th 546, 561 (2d Cir. 2024). Put differently, only when a discrete act "furthers a discriminatory policy and occurs within the limitations period can[ it] render timely a hostile[-work-]environment claim." *Id*. Although no "specific test" has been established for determining whether a discrete act is "sufficiently related" to conduct alleged in support of a claim for hostile work environment, courts within this Circuit consider: "(1) whether the timely and untimely discrimination is of a 'similar nature'; (2) whether the same individuals perpetuated the discrimination; (3) the frequency and temporal proximity of the acts; and (4) whether the employer took intervening remedial action." *McFarlane v. Cmty. Health Ctr. of Richmond, Inc.*, No. 25-CV-00410, 2025 WL 3625900, at *4 (E.D.N.Y. Dec. 15, 2025) (collecting cases). LAS contends that Plaintiff's termination is insufficiently related to her hostile-work-environment claim. (Def.'s Mem. at 8.) The Court agrees.

Here, in support of her claim for hostile work environment, Plaintiff alleges that: (1) LAS leaders micromanaged and excluded her from professional opportunities, such as serving as

second-chair at a trial, due to her race, (Am. Compl. ¶¶ 33, 117); (2) on at least two occasions, LAS failed to discipline its white employees who engaged in "discriminatory" or "racist" conduct, despite Plaintiff's complaints, (*id.* ¶¶ 27-28, 31-32, 40-41); and (3) on at least two occasions, LAS failed to advocate on Plaintiff's behalf with the Chief Judge of the Criminal Court, despite Plaintiff's complaints about the "discriminatory" and "racist" conduct of the Criminal Court employees, (*id.* ¶¶ 25-26, 39-40).[2]  Stated differently, Plaintiff alleges a hostile work environment based on race, arising from a pattern of mistreatment by co-workers and court personnel, which LAS failed to remedy, as well as mistreatment by LAS leadership.  Plaintiff alleges that her termination was motivated by an entirely different reason:  retaliation for reporting discrimination.[3]  (*See id.* ¶¶ 64, 73.)  Indeed, tellingly, when enumerating all allegations that comprise her seventh cause of action—hostile work environment and harassment—Plaintiff fails to make any mention of her termination.  (*Id.* ¶¶ 116-17.)  In contrast, Plaintiff expressly alleges that her termination, among other things, is a basis for her second cause of action—that is, retaliation in violation of Title VII.  (*Id.* ¶ 87.)  As discussed, *infra*, Plaintiff's termination certainly bears on Plaintiff's retaliation claim; however, it is plain that her termination is not alleged to be related to the conduct underlying her hostile-work-environment claim.  To put it differently, the allegations in the Amended Complaint do not give rise to a

---

[2] As an initial matter, although Plaintiff alleges that staff attorneys within both The Black Attorneys of Legal Aid and The Attorneys of Color for Legal Aid complained of "racist" instances, (*id.* ¶¶ 34-35), Plaintiff fails to plead when such instances occurred, (*see id.*).  Even assuming these "racist" instances occurred within the statutory period—which seems unlikely—where, as here, a plaintiff fails to plead that she "[was] not the target of [the] harassment, [was] not present for [the] harassment, and ha[d] no knowledge of the harassment while it [wa]s ongoing," a plaintiff "does not have viable hostile work environment claim." *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 264 (E.D.N.Y. 2019) (internal quotation marks omitted) (quoting *Maines v. Last Chance Funding, Inc.*, No. 17-cv-5453, 2018 WL 4558408, at *10 (E.D.N.Y. Sept. 21, 2018); *see also Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 182 (2d Cir. 2001) (concluding that "Title VII's prohibition against hostile work environment discrimination affords no claim to a person who experiences it by hearsay.").

[3] It is true that Plaintiff alleges that she was terminated "because of her race."  (Am. Compl. ¶ 73.)  However, as discussed, *infra*, the Amended Complaint includes no allegations from which the Court could infer such discriminatory intent with respect to her termination.  (*See* Section I.B.)

reasonable inference that Plaintiff's termination—allegedly resulting from Plaintiff's engagement in protected activity—is one of the "assemblage of [race-based] discriminatory acts" that underly her claim for hostile work environment.  *McFarlane*, 2025 WL 3625900, at *6 (quoting *Perez v. City of New York*, No. 1:23-CV-00447, 2024 WL 898943, at *11 (S.D.N.Y. Feb. 29, 2024)).  As such, Plaintiff may not present her termination and her purported harassment as "a single timely [hostile-work-environment] claim."  *Id.* (quoting *Perez*, 2024 WL 898943, at *11).

The factors that courts have considered in this Circuit when assessing whether incidents "are sufficiently related so as to be part of the same hostile[-work-]environment claim" also support this conclusion.  *Perez*, 2024 WL 898943, at *11.  *First*, Plaintiff's termination is not an incident of a "similar nature" as the alleged harassment perpetuated by her colleagues, court personnel, and LAS.  *See McFarlane*, 2025 WL 3625900, at *6 (citation omitted); *Russo-Lubrano v. Brooklyn Fed. Sav. Bank*, No. CV-06-0672, 2007 WL 121431 (E.D.N.Y. Jan. 12, 2007) (explaining that claims arising from actions that "ha[ve] the effect of creating a hostile, intimidating, and offensive environment" are distinct from claims arising from "termination on the basis of [race]").  *Second*, Plaintiff fails to allege that the same individuals were involved in the untimely acts of harassment:  Specifically, the Amended Complaint identifies Messrs. Pisciotta and Meir as perpetrators of some of the untimely acts of race-based harassment underlying Plaintiff's claim for hostile work environment.  (Am. Compl. ¶¶ 25-26, 31-32.)  That the acts of alleged harassment were committed by different individuals, alone, undermines any contention that the continuing violation doctrine applies to a claim for hostile work environment.  *Cf. Garrison v. Am. Sugar Refining, Inc.*, 789 F. Supp. 3d 291, 313 (S.D.N.Y. 2025) ("[The] plaintiff's allegations on []his [hostile work environment] claim all relate to comments and

12

actions taken by [one supervisor]—not by multiple different supervisor coworkers across separate departments, as is often the case when courts find that the continuing violation does not apply."). Moreover, Plaintiff fails to allege that either of the foregoing individuals were involved in the decision to terminate Plaintiff. (Am. Compl. ¶ 63.) Indeed, Plaintiff does not allege who effectuated her termination; instead; Plaintiff identifies only LAS, the entity, as being responsible for her termination. (*Id.* ("On or about August 9, 2023, LAS terminated Plaintiff's employment . . . .").) This, too, weighs against a finding that the continuing violation doctrine applies. *McFarlane*, 2025 WL 3625900, at *6. *Third*, based on what the Court can discern from the Amended Complaint, the most recent instance of race-based harassment occurred no later than June 2020, when LAS failed to discipline Mr. Kopacz, while Plaintiff's termination occurred in August 2023. (*See* Am. Compl. ¶¶ 40-41.) Although there is no bright-line rule regarding temporal gaps between incidents, it is "less plausible" that such incidents are related when, as here, there are gaps of one year or more between the incidences. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010) (finding it less plausible that incidents were related when there was a nearly one-year gap between them).

*     *     *

In sum, the Court finds that Plaintiff fails to plausibly allege that her termination "was part of the ongoing, discriminatory practice that created a hostile work environment." *King*, 96 F.4th at 561. That is, Plaintiff's termination fails to trigger the continuing violation doctrine. As such, Plaintiff's allegations concerning her claim for hostile work environment are barred by the Title VII statute of limitations. Plaintiff's claim for hostile work environment under Title VII is dismissed as untimely, accordingly.[4]

---

[4] Even if not dismissed on statute of limitations grounds, Plaintiff's hostile-work-environment claim would fail. With respect to Plaintiff's claim for hostile work environment, LAS contends that, because Plaintiff fails to allege

13

## B.  Race Discrimination

Under Title VII, it is "unlawful for an employer 'to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race . . . . ' " *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)).  "Discrimination claims under Title VII are analyzed under the [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),] burden-shifting framework." *Bjorklund v. Golub Corp.*, 832 F. App'x 97, 97 (2d Cir. 2021) (summary order) (citing *Vega*, 801 F.3d at 82-83).  "Under the [*McDonnell Douglas*] test, a plaintiff must first establish a prima facie case of discrimination by showing that: []'(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'"  *Vega*, 801 F.3d at

---

facts indicating that LAS acted against her because of her race; and because Plaintiff fails to allege that LAS's actions were "severe or pervasive," Plaintiff's claim should be dismissed.  (Def.'s Mem. at 9-10.)  Critically, in her opposition, Plaintiff fails to address a single argument advanced by LAS.  Instead, Plaintiff argues only that LAS, in its motion to dismiss, "ignored specific allegations . . . indicating that the actions that form the basis for her hostile[-]work[-]environment claims were due to her race" and "ignore[d] allegations concerning the pervasive nature pf the harassment to which [she] was subjected."  (Pl.'s Mem. at 13.)  That is, Plaintiff concedes the validity of LAS's argument.  *Nunez v. Cuomo*, No. 11-CV-3457, 2012 WL 3241260, at *19 (E.D.N.Y. Aug. 7, 2012) ("Plaintiffs appear to concede [the d]efendants' arguments, as they fail to acknowledge or contest them"); *Dolce v. Connetquot Cent. Sch. Dist.*, No. 24-CV-00622, 2025 WL 1070079, at *7 (E.D.N.Y. Apr. 9, 2025) (holding that, by "failing to respond to [an] argument" in opposition to defendants' motion to dismiss, plaintiffs "abandoned" their claim); *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) ("Plaintiffs' failure to oppose [d]efendants' specific argument in a motion to dismiss is deemed waiver of that issue" (citation omitted)), *aff'd*, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022).  On this ground, too, dismissal of Plaintiff's claim for hostile work environment is warranted.  *See Joseph v. United States*, 740 F. App'x 12, 14 (2d Cir. 2018) (summary order) (citing *Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014)) (affirming the district court's dismissal of claims as abandoned on a motion to dismiss because "[w]here a partial response to a motion is made—i.e., referencing some claims or defenses but not others ... in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *see also Adams v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 426 (S.D.N.Y. 2010) (dismissing plaintiffs' race discrimination and age discrimination claims as abandoned where "[Plaintiffs' opposition] papers fail[ed] to address substantive grounds raised by [d]efendants' motions [to dismiss], thereby supporting a finding that the underlying claims have been abandoned."), *aff'd sub nom. Ebewo v. New York State Educ. Dep't*, 460 F. App'x. 67 (2d Cir. 2012), *cert. denied sub nom. Cruz v. New York State Bd. of Educ.*, 568 U.S. 943 (2012); *Gill v. Phoenix Energy Mgmt., Inc.*, No. 15CV1102, 2016 WL 11825904, at *5 (E.D.N.Y. Sept. 30, 2016) (deeming retaliation claim abandoned, because "plaintiff neither dispute[d] [the d]efendant's arguments, nor defend[ed] th[e] claim in anyway" and stating that "[w]here, as here, [the p]laintiff fails to address [the d]efendant's arguments in his opposition, the [c]ourt deems [the p]laintiff's silence as a concession that [the p]laintiff is abandoning his claim.").

14

83 (quoting *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000)).  Significantly, at the motion to dismiss stage, a plaintiff need not allege facts that satisfy every element of a Title VII claim.  Rather, a plaintiff "need only give plausible support to a minimum inference of discriminatory motivation."  *Bockus v. Maple Pro, Inc.*, 850 F. App'x 48, 50 (2d Cir. 2021) (summary order) (quoting *Littlejohn*, 795 F.3d at 311); *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) (summary order) (quoting *Vega*, 801 F.3d at 84).  Stated differently, a plaintiff need only plead facts plausibly alleging that the employer took an adverse action against her, at least, in part, for a discriminatory reason.  *Carris*, 682 F. App'x at 32 ("To survive a motion to dismiss, a Title VII plaintiff does not have to plead a full prima facie case pursuant to the first stage of the burden-shifting framework outlined in [*McDonnell Douglas*]; she 'need only give plausible support to a minimal inference of discriminatory motivation.'" (quoting *Vega*, 801 F.3d at 84)).

In this case, LAS does not challenge that Plaintiff has sufficiently pleaded the first three elements of a discrimination claim.  (Def.'s Mem. at 13-17.)  Plaintiff has, indeed, alleged that she belongs to a protected class as a "Black" individual, (Am. Compl. ¶ 2); she "was qualified for all positions held during her employment at [LAS]," (*id.* ¶ 18); and she suffered an adverse employment action in the form of termination of her employment with LAS, (*id.* ¶ 63).  LAS maintains, however, that Plaintiff fails to plead facts demonstrating an inference of discrimination with respect to her termination.  (Def.'s Mem. at 13-17.)  The Court agrees.

At the pleading stage, a plaintiff may prove discriminatory motive either directly, by alleging facts that show an intent to discriminate, or indirectly, by alleging circumstances that give rise to a plausible inference of discrimination.  *Vega,* 801 F.3d at 87 (stating standard for proving an adverse employment decision was motivated, at least in part, by an impermissible

15

reason). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; [] its invidious comments about others in the employee's protected group; [] the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 502 (2d Cir. 2009)).

Here, Plaintiff fails to satisfy either standard. As an initial matter, Plaintiff does not include a single fact that would demonstrate discriminatory intent. Stated differently, the Amended Complaint contains no allegation that would directly support the minimal inference that Plaintiff's termination was motivated by discrimination. *See Vega,* 801 F.3d at 87. For example, Plaintiff does not allege that her supervisors told her, or any other Black attorney at LAS, that Plaintiff or Black attorneys at LAS were: (1) less talented as employees than another employee outside of their protected class; (2) ineligible to be promoted or provided similar opportunities as those outside their protected class; or (3) not entitled to the same privileges as co-workers outside of their protected class. *See Marquez v. Starrett City Assocs.*, 406 F. Supp. 3d 197, 209 (E.D.N.Y. 2017) (finding that, where the plaintiff had alleged that "his supervisors told him and other employees of Latino descent that 'they were not as good as the Italian employees and would never be promoted to the position of superintendent because they were not Italians' and 'that they would not be entitled to the same privileges as their Italian co-workers,'" the plaintiff had alleged "direct evidence of an intent to discriminate"). Similarly, the Amended Complaint is silent as to indirect evidence: Nowhere in the Amended Complaint is there an allegation that LAS criticized Plaintiff's performance "in ethnically degrading terms" or made "invidious comments about others in [her] protected group," i.e., Black individuals. *Littlejohn*,

16

795 F.3d 297 at 312 (citation omitted).  Indeed, the Amended Complaint does not contain any allegation that LAS ever referenced Plaintiff's race, generally or when terminating her employment.  (*See* Am. Compl.)  Nor does Plaintiff allege a "sequence of events" leading to her termination that might otherwise allow the Court to infer discriminatory intent.  *Littlejohn*, 795 F.3d 297 at 312 (citation omitted).  Instead, the Amended Complaint includes only a bald allegation that Plaintiff was terminated "because of her race."  (Am. Compl. ¶ 73.)  Such a conclusory allegation is insufficient to give rise to an inference that Plaintiff was terminated based on her race.  *Iqbal*, 556 U.S. at 678 (2009); *Faber*, 648 F.3d at 104.

In an attempt to save her discrimination claim, Plaintiff argues that discriminatory intent can be inferred from the disparate treatment she experienced based on her race, as compared to other employees outside of her protected class.  (*See* Pl.'s Mem. at 14.)  When relying on evidence that an employer treated a plaintiff less well than similarly situated employees outside of her protected class—that is, evidence of disparate treatment—a plaintiff must show that she was "similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Palmer v. Shchegol*, No. 14-CV-04406, 2016 WL 5678544, at *4 (E.D.N.Y. Sept. 30, 2016) (quoting *Mandell v. County of Suffolk & John Gallagher*, 316 F.3d 368, 379 (2d Cir. 2003)).  Here, Plaintiff alleges that white LAS employees used offensive terms "in group settings and through email communications" and were not subsequently terminated by LAS leaders.  (Am. Compl. ¶¶ 66-70.)  Specifically, Plaintiff alleges that Mr. Kopacz, a white attorney at LAS, stated that "it was his [F]irst [A]mendment right to say the 'N' word" and, upon information and belief, that Mr. Kopacz was not disciplined by LAS leaders.  (*Id.* ¶¶ 41, 67.)  Additionally, according to the Amended Complaint, a different white employee at LAS made an offensive comment while in the presence of several attorneys and was subsequently not

disciplined by LAS leaders.  (*Id.* ¶ 68.)  Plaintiff also alleges that, during the COVID-19 pandemic, a white male employee at LAS, who objected to appearing in court, sent an email to a colleague, copying "all LAS offices," which stated, "Hey you privileged asshole[. M]y 2-year-old and 4-year-old [are not] eligible for the vaccine. Google it, you piece of shit. Fuck standing next to my client. Get me the fuck out of there."  (*Id.* ¶ 69.)  According to Plaintiff, in response, Ms. Luongo only sent this employee an email informing him of the inappropriateness of his email.  (*Id.*)  Last, Plaintiff alleges that a white female employee, Virginia Conroy, who "constantly harassed" and made offensive comments to Black employees, as well as other employees of color, was not terminated by LAS leaders.  (*Id.* ¶ 70.)

Critically, Plaintiff fails to allege with any specificity the "offensive language" that she used, which resulted in her termination.  (Am. Compl. ¶ 62.)  Plaintiff similarly fails to allege the specific offensive language used by at least two of the comparators identified in her Amended Complaint.  (*See id.* ¶¶ 68, 70.)  The Court cannot fill these gaps.  Indeed, it is well settled that the relevant inquiry for determining whether a comparator is similar "in all material respects" looks to, *inter alia*, "whether the conduct for which [an] employer imposed discipline was of comparable seriousness."  *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000).  Against this backdrop, "courts in [the Second] Circuit have held that the plaintiff must at least plead allegations from which it is plausible to conclude that the comparators are similarly situated."  *Offor v. Mercy Med. Ctr.*, 167 F. Supp. 3d 414, 431 (E.D.N.Y. 2016) (collecting cases), *aff'd in part, vacated in part, remanded*, 676 F. App'x 51 (2d Cir. 2017).  Consequently, the Court lacks a benchmark by which to compare the offensiveness or seriousness of Plaintiff's conduct to that of the comparators identified in the Amended Complaint.  Based on this deficiency, alone, the Court concludes that Plaintiff failed to allege facts that would allow the Court to infer that she

was similarly situated to her comparators. *See Graham*, 230 F.3d at 43; *Offor*, 167 F. Supp. 3d at 431.

In addition, the Amended Complaint does not include a single allegation as to whether the decisionmaker involved in Plaintiff's termination overlaps with the decisionmaker overseeing the discipline of her comparators. (*See* Am. Compl.) Although not dispositive, the absence of this fact weighs against a finding of sufficient similarity and, therefore, further supports the Court's conclusion. *Radwan v. Manuel*, 55 F.4th 101, 136 (2d Cir. 2022) ("[U]nder Title VII, although any differences in terms of the identity and/or role of a decisionmaker are among the many factors that should be considered in determining whether a plaintiff's situation is sufficiently similar to a comparator for purposes of demonstrating disparate treatment, the lack of identical decisionmakers is not necessarily dispositive."). Plaintiff's claim for discrimination is dismissed, accordingly.

## C. Retaliation

Title VII further provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against [an employee] . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . . " *Vega*, 801 F.3d at 89-90 (quoting 42 U.S.C. § 2000e–3(a)). To that end, Title VII affords employees protection "against retaliation for protesting against [prohibited] discrimination." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 285 (2d Cir. 1998) (citing *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)). Under Title VII, a retaliation claim, like a claim for discrimination, is "reviewed under the burden-shifting approach of *McDonnell Douglas*." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citing *McDonnell Douglas*, 411 U.S. at 802–04). The first step under *McDonnell*

19

*Douglas* requires a plaintiff to "establish a *prima facie* case of retaliation." *Zann Kwan*, 737 F.3d at 844.  To establish a prima facie case of retaliation, a plaintiff must show that:  "(1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).  At the pleading stage, however, these elements are "relaxed." *Littlejohn*, 795 F.3d at 307.  For a retaliation claim to survive a motion to dismiss, a plaintiff must plausibly allege that a defendant discriminated—or took an adverse employment action—against her, because she has opposed any unlawful employment practice—that is, engaged in protected activity. *Vega*, 801 F.3d at 90 (citation omitted).

LAS contends that, because Plaintiff fails to plead any adverse action, dismissal of Plaintiff's retaliation claim is warranted.  (*See* Def.'s Mem. at 19.)  In its brief, LAS makes several arguments in support of this contention.  (*Id.*)  Specifically, with respect to Plaintiff's failure to plead an adverse action, LAS argues that:  (1) Plaintiff's allegations constitute, at most, "petty slights or trivial inconveniences" that are unlikely to deter any protected activity; (2) Plaintiff's allegations regarding Ms. Carter's statement to Black attorneys following Plaintiff's termination constitute only an "insulting statement[]", which is "hardly even an action, let alone [an] adverse action[]"; and (3) Plaintiff was not entitled to any paid leave and, therefore, LAS's denial of her request for paid leave does not constitute an adverse action.  (*Id.*)  Additionally, LAS contends that Plaintiff's retaliation claim is ripe for dismissal because Plaintiff fails to demonstrate that any adverse action occurred because of her engagement in protected activity—that is, causation.  (Def.'s Mem. at 20-22.)  With respect to causation, LAS specifically argues

20

that: (1) Plaintiff fails to raise an inference of temporal proximity between her alleged protected activity and LAS's adverse action sufficient to demonstrate causation; and (2) Plaintiff's use of "offensive language" constitutes an intervening event that defeats any inference of causation. (*Id.* at 21-22.) Notably, in her opposition, Plaintiff devotes a page and a half to LAS's arguments. Of that, Plaintiff includes only two sentences that are not mere restatement of law:

> Plaintiff alleges that her personal information was shared with the entire attorney listserv on three occasions in direct retaliation for her complaints concerning discrimination and retaliation in the workplace during her grievance meetings that occurred in June and July 2023. Further, Plaintiff's August 8[th] Email correspondence attached as Exhibit D to her declaration, sent one day before her termination, specifically constitutes protected activity.

(Pl.'s Mem. at 15.) That is, in her opposition, Plaintiff simply reiterates an allegation divorced from any argument in opposition to LAS's contentions and includes a single legal conclusion that is unsupported by any argument as to her engagement in protected activity.[5] Plainly, Plaintiff fails to specifically respond to any of LAS's arguments. As such, Plaintiff concedes the validity of LAS's argument.[6] On this ground, alone, dismissal of Plaintiff's retaliation claim under Title VII is warranted.[7]

LAS is correct that Ms. Carter's statement to Black attorneys following Plaintiff's termination and the denial of Plaintiff's request for paid leave following her termination do not constitute an adverse action.[8] However, LAS conveniently disregards Plaintiff's termination.

---

[5] In her opposition, Plaintiff also writes that she "made the requisite . . . showing . . . to survive a motion to dismiss" and "sufficiently alleges that she was subjected to retaliation by [LAS]." (Pl.'s Mem. at 14-15.) That is, Plaintiff includes legal conclusions unaccompanied by any argument in support thereof. Plainly, Plaintiff's conclusions, alone, do not constitute any argument.

[6] *See Nunez*, 2012 WL 3241260, at *19; *Dolce*, 2025 WL 1070079, at *7; *BYD Co. Ltd*, 531 F. Supp. 3d 810, 821.

[7] *See Joseph*, 740 F. App'x at 14; *see also Adams*, 752 F. Supp. 2d at 426; *Gill*, 2016 WL 11825904, at *5.

[8] With respect to the allegation concerning Ms. Carter's comment about Plaintiff, it is well settled that "'criticism of an employee [alone] . . . is not an adverse employment action' for retaliation . . . purposes." *Perez v. New York & Presbyterian Hosp.*, No. 05 CIV5749, 2009 WL 3634038, at *15 (S.D.N.Y. Nov. 3, 2009) (quoting *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001)). Ms. Carter's comment regarding Plaintiff, therefore,

21

(*Id.* ¶ 63.) Certainly, Plaintiff's termination constitutes an adverse action. *See, e.g.*, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (finding that "[a]n adverse employment action is 'a materially adverse change in the terms and conditions of employment'" and that "'[e]xamples of such a change include termination of employment'" (quoting *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004))).

With respect to causation, the Court agrees with LAS. As Plaintiff aptly notes in her opposition, a claim for retaliation requires, *inter alia*, a "causal connection between [a plaintiff's] protected activity and the [defendant's] adverse action." (Pl.'s Mem. at 18. (citation omitted).) For a plaintiff to sufficiently plead causation, she "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90. In other words, a plaintiff must allege that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 91 (internal quotation marks omitted) (citation omitted). Here, Plaintiff alleges that, in response to LAS's office-wide dissemination of its determination as to Plaintiff's appeal of the PIP, she "'replied all' and used offensive language to express her disagreement." (Am. Compl. ¶ 62.) Moreover, according to the Amended Complaint, on August 9, 2023, she was terminated by LAS for engaging in "hate speech" and "attacking a colleague." (*Id.* ¶ 63.) That is, Plaintiff alleges a plainly non-discriminatory reason for her termination. (*Id.*) This is fatal to her claim. *See Rubert v. King*, No. 19-CV-2781, 2020 WL 5751513, at *8 (S.D.N.Y. Sept. 25, 2020) ("Plaintiff's express acknowledgement, apparent from

---

fails to constitute an adverse action. *See id.* Next, Plaintiff alleges that, following her termination, LAS denied her request for paid leave and discontinued her healthcare benefits despite her pending appeal to be reinstated. (Am. Compl. ¶ 78.) That is, in essence, Plaintiff alleges that LAS failed to provide her continued benefits from a company at which she was no longer employed. (*See id.*) Plaintiff does not direct the Court to, nor has the Court found, any case concluding that such conduct constitutes an adverse act. This allegation, thus, fails to constitute any adverse act. Because each of the foregoing allegations fail to constitute an adverse act, the Court need not address them in its analysis of Plaintiff's claim for discrimination. *See Vega*, 801 F.3d at 83 (finding that, to have sufficiently pleaded a claim for retaliation, a plaintiff must allege, *inter alia*, that "she suffered an adverse employment action"); *see also Carris*, 682 F. App'x at 32.

22

the face of his Amended Complaint, that the altercation (a sufficient, non-discriminatory reason) led to his termination is thus fatal to his [retaliation] claims, even at the pleading stage." (first citing *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 222 (E.D.N.Y. 2018); and then citing *Vega*, 801 F.3d at 90)).  Accordingly, on this ground, too, Plaintiff's retaliation claim is dismissed.[9]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED, and Plaintiff's Amended Complaint is DISMISSED.

SO ORDERED.

Dated:  Brooklyn, New York
      March 31, 2026

/s/ LDH
LaSHANN DeARCY HALL
United States District Judge

---

[9] Having resolved Plaintiff's claims for the foregoing reasons, the Court need not address whether Plaintiff exhausted administrative remedies as to her Title VII claims for hostile work environment, discrimination, and retaliation.  Moreover, having dismissed the federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C.A. § 1367(c)(3))).